## The Exile, Her Tackle, etc.

*(District Court, D. New Jersey. July 5, 1884.)*

1. **LIBEL FOR WAGES—SAILOR—SHIPPING ARTICLES—CONTRACT.**
   After a sailor has put his name to the shipping articles the court must regard the terms of those articles as the contract finally entered into by the parties.

2. **SAME—SIGNING IN PRESENCE OF BRITISH CONSUL—INFERENCE—ESTOPPEL.**
   When it appears that a sailor signed the shipping articles in the presence of the British consul at Bordeaux, in the absence of proof to the contrary one must assume that the consul took pains to explain to him the nature, purpose, and effect of the agreement. The sailor cannot afterwards absolve himself from the performance of the duties undertaken by him, by alleging that he did not understand what he agreed to.

Libel *in Rem.*

*Beebe & Wilcox,* for libelants.

*Jas. K. Hill, Wing & Shoudy,* for claimants.

Nixon, J. This is a libel for wages. The defense is that the libelant had signed shipping articles for a voyage and deserted before the voyage was ended. The proofs show that the Exile is a British vessel, and that she was lying in the port of Bordeaux, France, about the first of August, 1883, when the libelant, in the presence of the British consul, signed an agreement for a voyage "from Bordeaux to Sandy Hook," and "or any port or places in the United States of America, or dominion of Canada," and "or any port or places in the known world, where employment may be obtained, trading to and fro, and back to a final port of discharge in the United Kingdom, or continent of Europe, calling for orders if required; voyage not to exceed one year." He was to act as cook and steward during the voyage, at $30 per month,—$20 of the wages being advanced on entry. The shipping articles are exhibited in the suit, and bear date July 30, 1883. The bark sailed for New York on the fifth of August, and arrived at that port on the eleventh of the following September. It appears in the proofs that as soon as he reached the port of New York he had conversation with the master about leaving the vessel. He asked for his discharge, alleging that he understood he shipped only to New York, or some port in the United States, of which nation he was a citizen. The master insisted, however, that he had signed for the voyage, which would not terminate until their return to the United Kingdom or the continent of Europe; but consented to discharge him in a few days, if he could satisfactorily fill his place, and if, in the mean time, he would clean up things, and properly attend to his work. On the thirteenth of September, between 4 and 5 o'clock in the afternoon, in the absence of the master, but in the presence of the mate, he packed up his clothes and left the bark. The official log of the Exile shows the following entry of the date of September 13, 1883: "David Mitchell deserted this afternoon, taking his effects." It is properly attested by the names of the captain and first mate. The libelant subsequently demanded of the master the balance of his wages due, to wit, $22; and, payment being refused, he filed this libel to recover the same.

There is no dispute about the libelant's signing the shipping articles, or that the contract was for one year, unless the voyage was sooner ended, or that the voyage contemplated a return to the united kingdom, or to the continent of Europe, after visiting Sandy Hook, or some other port or ports of the United States. Leaving the ship at New York without a discharge was a forfeiture of the wages which had accrued, unless the libelant had justifiable cause for leaving the vessel.

The libelant alleges that he had two good grounds for going ashore. The first one is that he informed the master, and the master under-

stood that he was expected to remain with him only until the vessel reached some port in the United States, whither he was bound, and where he belonged. The second is, misconduct on the part of the captain during the voyage to the United States. Bad treatment is alleged generally. The only specific acts referred to are the frequent offers of the captain that they should settle their differences by personal combat. The first is not tenable, no matter what the antecedent conversation between the parties may have been, after the libelant put his name to the shipping articles; the court must regard the terms of these articles as the contract finally entered into by the parties. The master was not present when the libelant signed the articles. The latter went before the British consul at Bordeaux, and signed in his presence, and one must assume, in the absence of proof to the contrary, that the consul took pains to explain to him the nature, purport, and effect of the agreement. He cannot now absolve himself from the performance of the duties undertaken by him, by alleging that he did not understand what he agreed to. I have had more doubts about the second ground. Seamen are entitled to proper treatment by their officers; and offers to fight by the master is certainly unofficer-like conduct. But in the present case it seems to have been harmless bravado. It was doubtless exasperating, but no injury resulted to the libelant, especially after he declined the contest, and told the captain that he had come on board, not to fight, but to do his duty.

After a careful review of the whole testimony, I am of the opinion that, under the general principles of the maritime law, the libelant has forfeited his wages by leaving the ship, without permission or discharge, in the midst of the voyage, and that the libel must be dismissed. In consequence of the master's belligerent disposition, I shall withhold costs.